Today is People v. Nasir, and for the appellant, Mr. Ryan, and for the athlete, Ms. Shepard, you may proceed. Thank you. May it please the Court. Counsel, I asked for an oral argument today primarily to discuss and answer your questions about argument one, which I think disposes of the whole case. In this case, Maricela Nasir, which I'm not sure if I'm pronouncing that correctly, I had some Spanish in college, but it's not my first language by any means, was running a restaurant, a catering, undisputedly legitimate business, and that business failed because apparently her expenses exceeded her income. It's not a crime to run a failed business, and not everyone who writes a bad check commits a crime. Sometimes it's merely civilly liable. She clearly owes Mr., I'm sorry, I keep wanting to say Mr. Holting, Mr. Tipsword slash J.R. Holting Produce. I use them interchangeably since he's a co-owner. Clearly owes him money. The line between civil liability and criminal liability is set by the Deceptive Practices Statute, which not only requires that you know that your balance is insufficient when you're writing the checks, and that you intend to defraud the particular payee at the time you're writing the checks. And the statute defines the intent to defraud as, quote, to act willfully and with specific intent to deceive or cheat, unquote. And the case law cited with the Bormet or Bormay case and Ogunsola, you know, have interpreted the Deceptive Practices Statute to mean that the intent to deceive has to be at the time the checks are written. So that intent to deceive is not shown by later attempts to repay or later failure to repay, or a later stop payment order. In fact, Ogunsola, in discussing that jury instruction issued there, specifically says there is no intent to defraud when someone writes a check knowing there isn't enough money at that time, but intends to have enough money to cover that check when it gets presented. And I think that is exactly what we have here. We have a high volume account. We have a business where money is going in and going out and clearly should have been monitored more clearly. We have an issue here about four unpaid checks totaling a little over $4,000, written between July 18th and July 24th of 1998. They're written the 18th, 21st, 22nd, and 24th. And I'm sorry that this is a bit dull, but I think that the numbers of the checks matter. The first three checks are $1589, $1990, and $1991. And the fourth unpaid check is $1594. So there's a little gap in that last sequence between the third and the fourth unpaid check. These are drawn on a legitimate bank account. This is not a stolen account. This is not a case where a more typical client of mine opens a checking account for a single minimal amount and then starts writing checks, each of which exceeds that minimum amount, without ever putting any more in it. $33,000 come into this account in the month of July, including almost $3,000 on July 17th, the day before the first check for $1,500 is written to Mr. Holting. I should say the first unpaid check. Unfortunately, or fortunately, I don't know, no one asks who some of these other checks they cleared went to, which I will get to in a moment. Another $8,500, over twice the total of the four checks, is deposited between July 18th, the first day, and the end of the month, July 31st. Other checks are being paid at this time. The check that preceded the sequence, $1588, for $532, was actually paid July 25th, which would be the day after the fourth check was written. So I don't know if that person, if that was Holting or not, but if that person had presented more than once, but it got paid. Check $1592, which is in the middle of the sequence, also gets paid, and that's for $1,079, which made me wonder whether that check was actually to Holting, and that actually got paid. But no one asked who these other checks were, too. We only had the details on the four checks that didn't get paid. And when I'm looking at the People's Exhibit 5, I noted that about 28 of the last 30 checks prior to these four checks for the Holting, or prior to the first unpaid Holting check, were paid. So you've got deposits. There's no suggestion that Ms. Nasir timed these checks or deposits to defraud only Holting and no one else. And of course it would make no business sense for someone who is trying to run a business, and there is no suggestion that she was not trying to run a legitimate restaurant, to defraud a supplier. Mr. Tipsword testified that apparently there's a Chicago-style hot dog stand called Tasty Chicago Grill, and Mr. Tipsword, the state's witness, said that he sold them items that help run that kind of business, food and I'm guessing napkins and condiments and things like that, restaurant supplies. Why would you defraud a supplier if you're trying to run a business? I think they're one of the last people. Did she and Tipsword have a conversation concerning the payment he billed? Yes. But Bormat says that later attempts to repay or not pay are not relevant to intent to defraud at the time the checks are written. So I think essentially what we have here, really I think the key when we're looking at what is intent to defraud is what's happening with the account. How many bank charges did she incur? A lot. What was the total? Do you remember? I don't remember. It was in thousands of dollars of bank fees, wasn't it? In charges? I don't know about thousands, but a lot. Unpaid insufficient funds checks for the stock payment. I thought it was at least three. Here we go. I'm just looking to see if there are... Well, some of these are deposited item return, but there's like... Oh, and there's a withdrawal of 40. Some of these are like there's a withdrawal of 450. The total of other debits and transfers is $1,623.28. 450 of that is withdrawing 450 from the account. And some of these are photocopy fees, but the vast majority are either overdraft charges or not NSF fees, which are all $34 a pop. And so I'm willing to bet over $1,000 anyway of it was. Clearly, and I think you could even fairly say that whoever was in charge or apparently not in charge of monitoring the balance, you could say that there was an element of recklessness to continuing to write the checks. But apparently... Is that argument made to the jury? I think counsel did argue that... Well, I don't know if he actually said recklessness, but there's no lesson included offense for it anyway. I think counsel did argue that there's no intent to defraud. And I'm just approaching that in my own way. Sure. But I guess what I'm asking you is, counsel made those arguments to the jury, that this was a business, that she had a lot of money going in and out of the account. But it was up to the jury to determine the issue of whether or not she had the intent to defraud. Right. And I'm saying there's no rational basis for that. When you look at the case law, which of course the jury isn't told these cases that say... Just because there's evidence about a conversation that occurs after the checks are not paid, about whether she's going to repay them or not. They're not told. They're not instructed that, you know, actually those are not... The Illinois Supreme Court and the Illinois Appellate Courts have said, those aren't relevant to determining intent. What we have here, I mean, and it's clear even from the state's brief, that while writing a check that doesn't clear, as I put it, is some evidence of knowledge that the balance was not sufficient and of intent to defraud, you need something else. And the only other things are irrelevant or not probative of any intent to defraud. Because again, I don't see how there's an intent to defraud when you have thousands of dollars coming in, checks, 20 of the last 30 checks have cleared. Checks being written at the same time are clearing. Well, what about the stop payment? She took merchandise and stopped payment. Yes, there was a $300 check. And again, Ogunsola says specifically that a subsequent stop payment, you can't infer from that there's intent to defraud. It says it right in the case. I'll have to take a look at that, but it seems to me... Hold my brief. If you issue a check, you accept merchandise, and you turn around for no reason other than you don't have money, and you stop payment on that check, I would think a jury might be able to infer from that you had the intent to defraud. You issued the check to get the property. You turned around and stopped payment on the check with no intent to pay it at the time the check was issued. Okay. And actually, I understand that. And actually, I agree that a jury might use that. And the problem is they're not allowed to. Here's the black board, which is on page 13 of my brief. This is from Ogunsola.  As when one consciously writes a check for more than the balance in one's account, intending to deposit funds to cover it, or agreeing with the payee that the latter not present it immediately but hold it as a note. In such cases, there is no intent to defraud, nor can it be inferred from the issuer's knowledge that his check is not good. Similarly, one cannot infer that because payment on a check was later stopped, the drawer issued it intending to defraud the payee. Well, that's not an absolute statement. No. But my point is that's all you, I mean literally, but that's all you're going to say, well, she stopped payment on it. There are no other attendant facts that suggest intent to defraud from that. And it says, I would say at least that this says that without anything else, that that's not enough. You can't just say someone issued a check and then later stopped payment on it, that that's intent to defraud without more. At any rate, if there are no further questions, I would ask that this Court vacate Ms. Nasir's conviction for deceptive practices and grounds that the evidence was not sufficient. Thank you. You'll have additional time when we vote on it. Ms. Shepard? Ms. Shepard? Ogunsola was not a sufficiency of the evidence case. It was a case in which the court found it was reversible error not to instruct the jury on intent to defraud. The language on which defendant opposing counsel relies is dicta. And it's also contrary to the statute, which specifically says that the defendant failed to have sufficient funds in the account when the checks were delivered is evidence of both of the elements of the required mental state that opposing counsel says were not proved in this case, that defendant knew the check would not be paid by the depository and that she had the intent to defraud. Well, let me ask you about the knowledge component. There seems to be a lot of money flying in and out of this checking account, which is not unusual for a business. And isn't it just as reasonable to suggest that Ms. Nasir is an ineffective bookkeeper as it is to say that she had the intent to defraud Mr. Tipsley? Well, as Justice Polk pointed out, the jury was presented with all the evidence and the standard, of course, wasn't just as reasonable to conclude, but whether or not their conclusion, whether any rational juror would have found what they found, whether, considering the light most favorable to the state, any rational juror would have found the elements of the offense. And here we have to remember, too, that the jury was specifically instructed on intent to defraud. And they found that she had that intent. Also, we have numerous non-sufficient funds fees, overdraft charges. There were 15 overdraft charges, 15 non-sufficient funds fees. They were assessed on roughly half, 10 of the 22 business days in the month of July, including the six business days beginning Monday, July 21st, which was the date of the first check and the date it was delivered, and was the next business, I'm sorry, the date of the second check, and was the next business day after the first check was delivered on Friday, July 18th. And the defendant herself testified that in July of 2008 she had several overdraft charges, several non-sufficient funds fees, a couple of stopped payment charges. She also testified she stopped payment on the fourth check because she didn't want anything else to bounce. And so instead of the check bouncing, she stopped payment. So she clearly knew that there were problems, that there were chronic insufficiency of funds in the account. Like the Sheffer case, no relation, the number of bad checks in this case, the evidence that at the time she wrote them, before she wrote them and afterward, she issued a large number of bad checks and that her account had a lower and negative balance. Her testimony showing she knew about the multiple overdraft charges and insufficient fund fees and that she stopped payment on the last check to Holting. Also her admission of Detective Barrows, that they did not have the money to cover the checks because of the problems they were having with the other location, and Holting's testimony that she refused to pay the checks and that he never was paid, and the fact that, as the courts in Sheppard and Brenner relied on, similar to those cases, that Defendant gave testimony which the jury could reasonably find not credible. For example, that she offered to repay the checks but Tipsworth refused and that she both kept a balance in the check register and was not in charge of keeping a balance. All of those things show that she both knew there were insufficient funds to cover the four checks and that she specifically intended to defraud Holting. And, of course, Defendant heavily relies on Gormit and Ogunsola for the proposition that you can't look at anything beyond the moment that the check was written. And, of course, as the Court well knows, as is true in all criminal cases, as this Court held in Sheppard, intent may be inferred from the circumstances surrounding the offense. The statute says that. And this is a very common principle in criminal law, as the Court knows. For instance, looking at the evidence of the Defendant's conduct after he enters a building may support the inference that earlier, at the moment he entered, he had the specific intent to commit a felony or a theft inside. Gormit applied the other provision in the statute that talks about how you can infer intent to defraud. It says in the statute that you can also infer both knowledge that the check would not be paid and intent to defraud from the Defendant having insufficient funds in the account when it was presented for payment and dishonored on each of two occasions at least seven days apart. So that's conduct that occurs after the offense. The Court in Gormit applied that provision, but then held it couldn't be corroborated by other later conduct. In other words, it was that the stop payment on the check. So that is illogical in itself. Gormit is also distinguishable because Gormit had money in his account when he wrote the bad check. It was a later check. He wrote the check on August 4th. He had sufficient funds at that time. But the next day, a large check that he had post-dated for September 1st was cashed prematurely. So that caused his original check to bounce. There was only one check in Gormit. Also, the language in Gormit that the Defendant relies on has not been cited by any other court. It relies on two cases. Ogunsola, which as we talked about, that language is dicta, contrary to the statute. Also contrary to other cases decided after that. The courts in Sheppard, Brenner, and Butcher all looked at later conduct of the Defendant in finding the records of intent. Gormit also relies on another case, Kunduk, which holds the opposite of the proposition for which the Court in Gormit cites it. The Court in Kunduk held that the Defendant was barred from introducing evidence that he intended to pay in later bankruptcy proceedings losses from his bad check and held such a defense is entirely irrelevant and that such evidence, instead of negativing any fraudulent intent, would tend to strengthen an inference thereof. Contrary to Gormit, the Court in Kunduk thus held the requisite intent for deceptive practices may be inferred from, but may not necessarily be negated by a Defendant's later conduct. So Gormit relies on cases, the Kunduk case holds the opposite of what it says it's relying, the Court in Gormit is relying on it for. Ogunsola, that language is dicta, contrary to the statute. So Ogunsola and Gormit are factually distinguishable. The propositions for which the Defendant cites them are aggregated or erroneous. The evidence which the jury considered under the applicable standards including a definition of intent of fraud, the jury found that that evidence established Defendant's guilt and that she had the requisite mental state. Is it correct that this business, whether it was under the guise of a personal or a commercial bankruptcy, did take bankruptcy? Whether the business, whether she filed for bankruptcy? I don't remember that from the record, Your Honor. It strikes me that she writes these checks in July of 2008. She's not charged until over a year later, 2009. And it would seem to me that if she had filed bankruptcy upon the dissolution of her business, the debt to Holting would have been discharged in that bankruptcy and the only way to avoid the discharge would be to prosecute her criminally. That's something that's beyond the record as far as I know, Your Honor. And, of course, whether or not, as the Klimt case holds, and that was cited in Mormant, of course, that if you file for bankruptcy that actually goes the other way, that it would support a finding of intent to defraud. It wouldn't negativate it. So as far as what decision was made as to whether to charge the Defendant, whether or not those elements were present at the time she committed that offense, you can look at later circumstances, but those, to my recollection, there's no evidence as to whether or not there was a bankruptcy. So I move on to the best evidence issue. The State wants to withdraw its estoppel argument, but as discussed, also discussed in the State's brief, the best evidence rule has been applied in years past according to varying standards, but always with the aim of guarding against fraud. According to Klisnick, for example, found no violation of the rule where there was no evidence of bad faith on the part of the custodian of the original, and as the court in Freedman State had cited in the Supreme Court's decision in Baptist, the best evidence rule requires that when proof is sought to be made as to the contents of a written instrument, that instrument or a true copy must be produced for its absence explained. This case involves what all the witnesses agreed were true copies or duplicates of the original checks. There was no issue as to the authenticity of those copies or the originals, and there was no unfairness in admitting the copies instead of the originals. Exhibits 1 through 4, thus, are admissible to the same extent as the originals, and the best evidence rule does not apply. Now in preparing for oral argument, I found a couple of cases that I didn't cite in my brief that have to do with the best evidence rule. I talked to Mr. Ryan about this yesterday and gave him the cites for the cases, and he said at the time and confirmed this morning that he has no objection to my talking about them. With the court's permission, I briefly described these cases. Go ahead. Okay, thank you. One is People v. Bowman, and that is a 5th District case from 1981. The other one is Indian Valley Golf Club v. Village of Long Grove, which is a 2nd District case from 1988. And I have copies of those cases. The court in Bowman held that a copy of the defendant's confession was properly admitted to trial, rejecting his argument that the state failed to lay a proper foundation for it under the best evidence rule. The court noted the current trend of the law of evidence away from strict adherence to best evidence foundation requirements where photocopies and other duplicates of original written instruments are involved. It applied Federal Rule of Evidence 1003, which states that a duplicate is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original or in the circumstances it would be unfair to admit the duplicate in lieu of the original. The court stated the rule applies only to duplicates, which we have here, and stated cases applying the rule express what implicitly has been recognized in Illinois which is a case that the state discussed in its brief, that the accuracy of the duplicate resulting from the reproduction of the contents of an original is in most cases no longer a significant issue. Relying on Bowman, the court in Indian Valley also applied Federal Rule of Evidence 1003. It ruled that the trial court did not err in admitting an evidence certified copies of deeds where the appellate Longgrove raised no issue as to the authenticity of the original deeds other than objecting on a purely technical basis to Indian Valley's failure to produce them and there are no circumstances in the record to require further inquiry into their whereabouts. Here all the witnesses agreed that exhibits 1-4 were copies of the original checks. There was no issue as to the authenticity of the originals. Exhibits 1-4 were admissible under Bowman, Indian Valley, and the Federal Rule pertaining to copies of which those cases apply. And unless the court has further questions, the state would ask that you confirm. I don't believe so. Thank you. Would you like copies of these cases? Sure. That would be fine. Mr. Ryan Rebuttal? A couple of things before I begin, before I get lost in the track of the argument. I would like to point out that every argument the state has made suggesting that Bormat was not valid is waived. At no point in its brief, even though I relied on Bormat for several oppositions of law, at no point in its brief did it suggest that it was not properly decided or that it relied on cases that it had misinterpreted. It simply distinguished it in saying that case is not this on its facts. And it doesn't grant relief here. It never attacked the basis of Bormat, even though that would have been the proper stage to do so. Also to follow up on Justice Appleton's thing about the bankruptcy, it actually is in the record, it's in my statement of facts. Prior to trial, the state filed a motion in Lemonade to bar Ms. Nasir from introducing evidence that their business had filed for bankruptcy in August of 2009, 13 months after the checks were written. And apparently at that point, and by the way, I don't think it's a coincidence that that's the month that Detective Barrows goes to talk to my client about what happened. And then charges are filed in September. And so again, the timing suggests that basically the criminal charge could have been an assistance from keeping them from being discharged in bankruptcy. And it was the state who filed this motion in Lemonade. And I think it's completely absurd to say that filing bankruptcy is further evidence of intent to defraud. I mean, I think it's consistent with the state's conflation of civil liability with criminal liability. That you file for bankruptcy is a recognition that you owe money, not that you committed a crime in owing money. At any rate, the state, as it did in its brief, basically criticizes Ogunsola. It first points out that Ogunsola was an instruction case, not a sufficiency case, and that's true. However, that fact doesn't mean that they didn't mean what they said when they were discussing why a jury instruction that just says knowledge is not sufficient because it has to say knowledge and intent. And it goes on to explain the differences and how it's possible to have knowledge and not intent. Also, it's not dictum, because these were part of its explanation of why there was an error in the case. I pointed this out in the reply brief, and the state doesn't respond to it. After they said all the stuff that I quoted in my brief, they said, therefore, the instruction was error. That's part of the holding. It's not dictum. Also, it doesn't contradict the statute, the presumption statute. Again, as I pointed out in my brief, and not responded to by the state, Ogunsola says having a deficient balance without more is not intended to defraud. The presumption simply says that it's some evidence, but it's not enough. And I don't think there's any contradiction between those two things. Also, the state says this case is like Shepard, but it did not factually compare this case to Shepard in its brief. It also mentions the Brenner case, which I distinguished. There were two checks written two days apart for about $14,000 total at a time when the balance was $600. And at one point, that person made a deposit of like $6,500, $6.7,000, which the court pointed out was enough to cover one check for part of one day. Here, way more money than the amount of the checks that are unpaid is coming through, is coming into the account. Brenner isn't even remotely like this case in terms of the amount of money coming in. Again, as I pointed out in my reply brief, her statement to Detective Barrows is nothing more, 13 months later, is nothing more than a hindsight recognition. Again, the state doesn't explain, ever, how saying, well, we tried to open another business with family members, that wasn't doing too well, and that's why there wasn't enough money in the account, is nothing more than a hindsight recognition. I don't see where it says anything about intent to defraud, let alone knowledge at the time. And in fact, the prosecutor doesn't argue it's intent to defraud. The prosecutor only argues, and I think incorrectly, but nonetheless, only argues that this shows that she didn't have the knowledge, or that she had, sorry, that she had the knowledge at the time she wrote the checks. I think effectively, if Ogunsola means what it says, then the state doesn't have the proof. And so the state is stuck with trying to say that Ogunsola is not valid, that the Illinois Supreme Court was wrong, and I don't think that's the case. As for the second issue, just to briefly respond, the Carter case is completely irrelevant. I mean, it deals with a confession. Of course, the state's attorney is going to know what happens to it. So it's enough for them to say, well, this original is fragile. We destroyed it, so we made a copy. Do I, may I? Finish your thought. Okay. At any rate, well, briefly, Tipsworth and Dousman never, ever said there was true and accurate copies. In fact, Mr. Tipsworth said he didn't know who had the checks, and his wife is the one who handled them, so he never saw the originals. He could possibly have said they were true and accurate. Dousman wasn't asked about them at all. He just says these copies are generated in the regular course of business, which is a totally different exception. Gliznik dealt with lack of bad faith. That's only relevant if the proponent loses the original. Here, there's no suggestion the state lost the original. It was sort of like a Carter thing. It wasn't in bad faith they were destroyed because they were fragile. And I would point out, finally, that the Indian Valley case involved a certified, self-authenticating copy of a deed, which we don't have here. And even under the test applied in Bowman, the four-part test, the original existed. It's unavailable. The substitute's authentic, and diligence on the proponent to procure the original, the state is one for four under the four-part test actually applied in Bowman. It's only a dicta that it asks that, in 1981, that Illinois change its law to adopt a federal rules of evidence thing that just looks at whether it's, is there any dispute about whether it's authentic or not. That was merely a policy dictum at the end. It's not the holding. And the new cases don't, I don't think, help the state's case at all. Mr. Ryan, isn't that copy of the check a business record of the bank? Yes. They don't have an original. And that was introduced through the banker as a business record, wasn't it? I am assuming so. But counsel objected, which is a separate objection, that it didn't meet the best evidence rule. I'm not saying it's inadmissible under the regular course of business. I'm just saying it was, it shouldn't have, it didn't meet the test for best evidence. Thank you. We'll take this matter under advisement. We'll stay in recess until the readiness of the next case. Thank you.